We will hear argument next in Case 23-367, Starbucks Corporation v. McKinney. Ms. Blatt? Mr. Chief Justice, and may it please the Court, Section 10J authorizes district courts to grant preliminary injunctions that they deem just and proper. 10J thus requires district courts to apply the traditional four factors as set out in Winter v. NRDC. This Court should All that mattered below was whether any facts supported a non-frivolous legal theory and whether there was harm, not whether that harm was irreparable. The government argues that whether a two- or four-part test governs, statutory context compels district courts to conduct, quote, a less exacting and more differential inquiry into the merits without undertaking an intensive effort to resolve factual issues. But 10J contains no language, much less clear language, diluting the traditional standard. Preliminary injunctions are extraordinary and drastic remedies. Here the Board seeks a coercive injunction backed by contempt sanctions, and the Board seeks the very same injunctive relief that it would get if it won the case. Such relief is highly inappropriate absent a clear showing under all four factors. The government justifies deference because the Board, not trial courts, ultimately decide the merits at the back end. But Congress directed trial courts, not the Board, to apply the winter factors at the front end. The Board hasn't even made any factual findings to defer to. Agencies have no expertise whatsoever in how courts should exercise their equitable discretion. Indeed, the Board in its adjudication will not even consider the four winter factors. This Court has never deferred to an agency's litigation position, and it should not start here. I welcome your questions. Mr. Blatt, the government says that Petitioner's ahistorical decontextualized approach is inconsistent with the statutory text, the basic premises of equity, and over a century of case law. What's your reaction to that? No. I don't even know where they're getting that. I mean, this Court in winter and a million other cases have said that these four factors are longstanding, and the clear statement rule goes back to justice story. But I just think the text on its face, you don't have to get too far, says just and proper, that obviously harks to traditional equity, and here we have the four factors. Do you think the government argues that because they are protecting the Board's jurisdiction as opposed to the court's jurisdiction, that that's a difference? Not at all. Not at all. I mean, a preliminary injunction, I mean, it's assigned to the district court. It has the same reasons. You have to show that there's a likelihood of success on the merits, and obviously if the harm is recoverable, you're not entitled to the injunction at all in balance of the equities. There's no, I don't even understand the Board's jurisdiction. There are a multitude of contexts where an agency has an adjudication, and if it wants a preliminary injunction, it's got to make the showing that every other party would have to make. But this is not just the standard preliminary injunction that district courts do on a daily basis in regular, ordinary cases within their jurisdiction that they control. I mean, this is an injunction that is being provided for in a specific paragraph of this statute, which I'm sure you agree does, the statute, require some consideration of the Board's prerogatives. The Board is the one that is ultimately making this unfair labor practice determination in the first instance. Congress is setting up a Board to take care of these issues. So it's not the ordinary PI that the district courts see, correct? No, not at all. It is an ordinary preliminary injunction, and this is an ordinary statute with a call to just and proper remedies, and we cite six statutes in the U.S. Code that use the just and proper standard, and a multitude of statutes say necessary and proper or just proper. No, I understand, but we are in a particular context, and I think the context has to inform how we understand what Congress intended with respect to this provision of the statute providing for this kind of injunction. Well, maybe we should just talk about what we're talking about, and that is, does anything in that statute or anything in common sense say the Board gets to walk in and get a coercive injunction on the notion that they have a non-frivolous legal theory, and the district court is barred from finding facts, it's barred from weighing witness credibility, and all that matters is the government has not presented a joke. Well, I guess what I'm referring to is that we already have a very different context insofar as the Board is assigned by Congress with the requirement or duty to investigate unfair labor practices and make the decision in the first instance as to whether or not they occurred. That doesn't happen in other PI contexts, so I get that in other PI contexts the district court is doing the fact-finding and all of the things you're talking about. This is a different context. So on pages 42 and 44 of our brief, we cite SEC, FTC, CPFC, I'm going to run out of the alphabet, EEOC, a bunch of cases where agencies have adjudicatory processes. There's three that we cite on pages 23 and 42 where it involves you can go to district court. But remember, neither the Board nor the Court of Appeals on reviewing of a final agency will ever consider the normal standards for preliminary injunction. In terms of where all this leads you is why would the Board get deference when the Board doesn't deserve any deference and has no expertise on how equity should be weighed. And in terms of we can talk about the four factors, at most statutory context, like every other injunction takes account of the statutory context. If we were here because there was going to be a nuclear accident, I would think that's an important statutory context too. Ms. Bluthat, you've used in your brief 12 times the description of using the stringent version of the four-factor test. Is that different than the standard four-factor test? This court in the Farmer v. Walsh and in Winter said clear showing. But yes, I think that is a stringent. So it's different than the traditional? Traditional factor test is a clear showing. All right, now you're doing something else. I understand very well why you say we don't give deference to the Board on the likelihood of success on the merits, which there's some language in some of the court's decisions below that they think they have to, and that's the stuff about not weighing credibility, et cetera. I do understand why that needs to be corrected, because you're right. It's the court that has to decide the likelihood of merits. But with respect to the other three prongs, irreparable harm, balance of the equities, public interest, in Winter and Ken we talked about that there has to be a recognition of the public interest, the Navy's interest in doing what it needs to do. Here I think it's in the NLRB's interest in making sure that its remedial power can be returned after the status quo. We have to consider in the balance of equities, the court below, the harm both to the employer, but the harm to the union and the harm to the NLRB. And finally, the public interest is clear in the Board's requirement. So I don't know that either Winter or Ken or anything else, the word deference is just misplaced here. Well, so we've gotten likelihood of success off the table, but both the Court of Appeals and the trial court refused to find any facts even on the irreparable harm. So all the Board's side of the evidence and only one side of the evidence was considered on irreparable harm. And in terms of irreparable harm, that's something that district courts do day in and day out. And what the Board has here and has been arguing in all these cases and what the Court of Appeals found is any time there's an unfair labor practice, if you can show evidence of chill because people are afraid of being retaliated against if they support the union, then, and I'm quoting from the NLRB, that faith in workplace democracy can never be restored. And so in their manual, their 10-J manual, it's basically a playbook. In every case, they say fill in the blank. They're always saying if there's evidence of chill, if anyone says I mean, firing all eight of the union organizers, I think Well, if all eight to see that, although I do understand that some of the organizers did different things than others. And the ALJ, who's made factual findings here to whom the court will have to eventually give deference, found that at least two of these union representatives should have been fired because they did something more than stay after hours. There were employees there who were staying after hours that weren't fired. Remember, we're here on the injunction. Obviously, the ALJ's findings don't deserve any deference. If there's a final decision by the board and that goes to a court of appeals, they get substantial evidence deference. But I'm going back into the injunction standard. If all eight employees commit gross misconduct, then there's, you know, that's a But there were other two others who didn't union organize that weren't fired. And one union organizer didn't engage in the misconduct. It wasn't fired. You don't dispute, though, that district court could take that fact that Sotomayor mentioned into account in the course of weighing whether an injunction's warranted? Absolutely. I mean, this is a classic case of burden shifting. Was there anti-union animus that justified, that prompted the terminations? And Starbucks managers explained that, and the employees conceded this violated company policy. So the only issue is whether the policy was enforced in other stores. Yeah, protectual, and a district court could make that determination the way the ALJ did, perhaps. Exactly. The problem in the circuit split is, and in this case in particular, both the district court and the court of appeals said district courts are barred from considering the evidence. And if you count the board's theory that whenever you have a harm to unionization, and their story is union support is very fragile, whether it's before the union's been voted in or after the union's voted in, and any time you have an unfair labor practice, that's irreparable harm. And we're just saying no. But you'd be happy with weighing, right? You'd be happy with weighing the harm to the union organizing against the harm to Starbucks in retaining the employees who had violated store policy by staying after hours with all the pretext considerations that Justices Gorsuch and Sotomayor have referred to. You'd be happy with that, the balance. I'm very happy for factor three, but factor two is irreparable harm. Wait, before you leave factor three, why is, I'm sorry, is that the irreparable harm factor you're talking about? Right. Balance of the equities was exactly what Justice Barrett said. Oh, I see. All right. So irreparable harm. What is the, what is being addressed there? I thought it was the board's, whether the board's remedial authority would be harmed. That's why they're seeking the preliminary injunction. Yeah. And that just is empty words without saying what, what in the harm is irreparable? Why can't an order of reinstatement matter? And the problem with the board's theory in all these cases is they're always entitled to an injunction. There's always irreparable harm by definition. But you, you, you've said that many times and you suggest that this is happening all the time. There's record evidence that in the last year, the board has sought 14, 14, uh, 10 J injunctions. So it's not as though this is happening a lot. Well, totally fair. Just when it happens. But in terms of the. Right. But what I'm saying is if, if we're, if we're worried about an abusive board, uh, doing things that it's not supposed to be giving undue deference, it seems like the board is pretty careful when it's determining whether or not to even seek these injunctions since it's only asked for it 14 times. Well, I'd like to take that on because I do think that they are relying on the fact that they've done a fair investigation and no matter how much investigation and how much careful consideration, it's still a litigating position. It's not the fact finding the adjudication that Congress assigned it. And second of all, the board is asking for more deference to a litigation position that it would get at the back end. The board could never get this kind of deference even if it had gone through the full adjudication. And third, the board can't have it both ways. Either they're spending so much time investigating, maybe they should spend that time adjudicating so you don't need these year long injunctions or if they're saying, well, it takes so long for us to adjudicate maybe because it's a hard question. But I guess what I'm saying is they're only saying that in 14 cases. I mean, you're right. Maybe, maybe they should be going faster, but they have only asked for this kind of injunction in a very, very small number of cases. 20,000 complaints are filed with the board. 700 result in board action. And of those 700 that the board is investigating and doing and determining, they've asked for this kind of injunction 14 times. So, I mean, I appreciate that maybe the standards we need to look at, and I understand four factors versus two factors, but this is not sounding like a huge problem. Well, restraint is not a basis for deference. And whether or not it's a huge problem, what factors that agencies and private parties should get. So even if the board only sought one injunction, can you please hold that the four factors apply? When you said the normal process, so it's just the traditional four factor test applied normally? That's what you want? Yes. I hope I didn't. That's not a trick question. Yeah, no. It's supposed to be a clarifying question. Yeah, four factors with no deference, and to please make sure that Maybe I'll take that as a compliment. That you think I'm that crafty, but really I think we definitely need a reversal with the four factors. And just on the irreparable harm part, you say in your reply brief that under that four factor test applied normally, the court is supposed to decide whether delay is going to frustrate, I'm using your words, frustrate the board's ability to remedy the alleged unfair labor practices. So you have no problem with that. Right, as long as it's actually irreparable. So let me just see if I can try to help here. Chill can be irreparable, but it has to be chilled from something that's about to happen, an event that can't be unscrambled. And so when we talk about the board's remedial factors, it can't be faith in workplace democracy. It has to be, there's an event, there's an election that they've actually barricaded the store and employees can't get in to vote unless we get this injunction, you can't recreate the condition. So that's all we're talking about. And there the board's remedial power is being frustrated and there's irreparable harm. But all the more reason, balance of the equities, it may be that the employer had to shut down the store because it's not making money. And on the equities and the public interest, I mean, I think also in your brief, you acknowledged that when a statute like this is involved and public interests are involved, a court is supposed to take that into account in a way that's different from what it might in a statute between private parties, excuse me, in a case between private parties with only private interests. I think that's correct because by definition, the public interest is broader than a breach of contract. And if you have, you know, the environment or, I don't know, voting rights, there's public interest. But the case that this originates and in the Oakland Cannabis and the Virginia Railway, it's public interest has deliberately expressed in legislation. So where the court has been on public interest is saying district courts can't reach out the confines of the statute, either in going too far or too little. And that's, that I think does go to public interest. But I do think our point is, because public interest wasn't even referenced below, except for the district court saying there's a public interest in the statute, is that if there's not a showing under all three factors, the public interest is not served by, you know, putting a scarlet letter on an employer and having them just live under injunction that they violated the act based on a non-frivolous legal theory with not even their side of the evidence being heard. That is very damaging to the public interest. Are you saying that chill is never enough for reparable harm? No, chill can be. It can be? Yes. It's just that it requires more of a showing than the Sixth Circuit required here? Yeah, so the Sixth Circuit three times said, you know, there's inherent chill. But they also pointed to evidence of chill. And all we're saying is evidence of chill needs to be tied to something that can't be undone. Like, we can't vote. Now that we're chilled from voting, there's about to be a vote. The court said two things here in terms of chill. They said no one was wearing union pins because they were scared. And two, the terminated employees, although they're on the bargaining unit, it's not as convenient to talk to your, the fellow employees if you're not on the shift. And those are harms, but they're not harms that are, they're not the harms that are irreparable unless you're going to say any time that you have a allegation there's fear of retaliation or an encumbrance, somehow that's not reparable. There was not even a bargaining thing scheduled. The union had just won the vote. Now you're doing, asking us in the opinion to weigh the factors ourself and say what the correct weighing is. I wouldn't do that if I were you. I thought you, right. All you came in here and said, apply the traditional test, right? Yeah, I agree. I was just trying to explain to Justice Barrett that we concede that chill could definitely be relevant, but what we're concerned about is the board's definition of chill automatically leads to whenever there's something against unionization effort, that's irreparable harm. But yeah, if I were you, I would leave this a very short opinion, but please make clear that irreparable harm means irreparable. Can I ask you about likelihood of success in this situation? I know others may have taken it off the table, but I'm a little curious as to why the district court would not at least have to put itself in the shoes of the board when making this predictive judgment. I mean, this is why I said context matters in my view, and that we're in the context of a statute in which Congress has given the board the ability to determine the merits, and at least in the first instance, and the ability to make the investigation, to find the facts. And in this context, that body has made a preliminary determination in these 14 cases that an injunction is warranted. So is that relevant to the district court's this as though there was no board, or the board is just one of the parties and doesn't pay any attention to those preliminary determinations? It's totally irrelevant because when the board is a prosecuting party, it is a party that the NLRB's, the general counsel, he's an adversary. But not according to the statute. The statute doesn't just relegate the board to prosecuting determination. And so when you're asking in the context of the preliminary injunction, what is the likelihood of success on the merits, it doesn't seem to me to be irrelevant that the board has determined, based on its preliminary investigation, that an injunction is warranted. Well, it's the general counsel, as a separate authority under the statute, but I would be embarrassed if I were the board to say, yeah, we've made up our mind, and we hope district courts... No, it's not that they've made up their mind. They haven't. The question is, given this unique statutory context in which we have the board as a fact finder and a decision maker, and also a prosecutor, as you've pointed out, right? That's what makes this context different than when we would ordinarily apply the four factors as a court. We have an authority here that has made a preliminary determination that these facts are such that there's a likelihood of success on the merits. So how can the district court ignore that? Because that, what you just said, basically sums to a litigation memo that a lawyer wrote to the board, and the board signs off, not in its capacity as a fact finder, but it's just authorizing litigation. There's nothing to defer to. They haven't found any facts. Is your point here that the litigating arm of the board has brought this action, but the board and its adjudicative powers, as the board, has not yet determined anything? And they better not have, because then they're going to look biased. But more importantly, the board, the litigating arm, can file this injunction and then turn around and change his or her theory before the ALJ and the board. It's not... I understand, but we're talking about a prediction. And so I would think that the litigating arm of the board would have a pretty good predictive capacity in terms of assessing what the board might do in this case. And I just want to know why that's irrelevant to a district court in this situation also determining likelihood of success on the merits. Okay, so if you have a pure legal issue, this is completely irrelevant, because who cares what a lawyer in NLRB thinks? I mean, if there's a meaning of the statute, it just doesn't matter. In terms of this case, which is a question of burden shifting in terms of what caused determination, that is a mixed question of law and fact. And if it takes the board two years to figure it out at the back end, it can't be that you would get deference when they haven't found any fact. I suppose otherwise, a district court might take cognizance of the fact that agencies almost always win before they're treated as bodies. If they have a 90% success rate, we'll always lose. I mean, really, that can predict, and the board tells courts this, you should know we're going to win because we always win. That's in their manual. I mean, the fact is, the government cites at page 39 of its brief that applying the two-part test, the success rate of the NLRB is only 61%, so it's not a rubber stamp. Even the two-part test is not. Right, and we're saying that's because in the two-part test, the overwhelming cases settle. And so that takes, it's pretty, the fortitude of those employers that fight on this, probably because they have a good case. But whether or not they win or lose, it should be the right test. It's kind of interesting, too, that the government fights a test that it claims it does better under. I don't understand the government's position, except to say that It points out it does better with the four-part test, with the two-part test, but yet it's fighting the four-part test. I think the government's view is we'll take the traditional test if you apply it untraditionally. Consistent with the untraditional context in which we are operating. Yes, and all I'm trying to say is it's not that untraditional to have an administrative agency. There's a lot of them in the federal government, and the Congress authorizes injunctions a lot. And when it uses terms like just and proper, Congress knows how to, and we cite examples in our brief, to give the agencies a leg up. It does that, or at least in the trademark context, it does in another context where they'll presume irreparable harm. I think Congress knows how to do that. But the fact it went to the district court, which is completely outside the normal process of board review, suggests that Congress expected district courts to do what they do all the time, and that is to apply Winter. Isn't the history of this that Congress originally took the district courts completely out of it, and that they just kind of brought them in in this one capacity? That's what I'd understood. Yeah, that's correct. Norris LaGuardia basically put almost an absolute categorical ban on injunctions, because courts were too aggressive in stopping unions. And then it shifted in 1947, pro-employers. So it's a little ironic that the government is relying on a statute that was supposed to help employers. But the district court is supposed to exercise the just and proper discretion. Otherwise, it's banned under the statute. Norris LaGuardia from entering an injunction. Justice Thomas? Justice Alito? Justice Barrett? And Justice Jackson? Okay. Thank you, counsel. Mr. Rayner? Mr. Chief Justice, and may it please the Court. I think the question in this case has narrowed considerably, so I'll just walk through the factors. First, on irreparable harm. In its opening brief, Petitioner fought the idea that the irreparable harm inquiry should focus on whether the board is going to be able to remedy the harm at the end of its proceedings. At page two of its reply, it now concedes the focus is on the board's remedial power. And I nursed in my friend to further concede that point in her argument this morning. Second, on harm. The question is not whether there is a certainty of harm. The question is whether there's a likelihood of harm. The test used by the Sixth Circuit is reasonably necessary. That's the Ahearn case. We think that's fully consistent with this Court's unlawful discharges necessarily show irreparable harm. The question that the board looks at and the question that we think the Court should look at is whether that extinguishes the momentum of the union drive or impairs it in such a serious way that an order from the board a year or two down the road won't be able to restart the drive. Second, on public interest and the equities. Our basic point here is that when Congress makes a judgment about what is in the public interest, the Court cannot override that judgment in weighing the equities at that stage. This is the Oakland Cannabis case. The Court says if Congress has made a judgment that something is unlawful, you can't basically make that thing lawful at the equities stage by refusing to enforce Congress's judgment. That doesn't mean that in some cases at the preliminary stage if there's extremely compelling interest on the other side or public interest on the other side that an injunction will automatically be necessary. But we think that in a case like this one where Congress has made a judgment in a run-of-the-mind case, there's only going to be purely private, profit motive interest on the other side. Injunctive relief is typically going to be warranted. Again, I think Petitioner concedes this basic point at page 13 of its reply. It says that courts are not entitled to revise Congress's judgment. Third, that leaves the merits, which I think has been the subject of a lot of discussion this morning. We think that the Court should take into account all relevant context. One piece of context is the statistics that Justice Jackson mentioned. The Board receives 20,000 unfair labor charges every year. It issues 750 complaints. Last year it authorized 14 petitions and filed 7. That's 7 out of 20,000. We think a court can properly take account of that in trying to make a predictive judgment about how the Board is going to come out. This ultimately is a predictive judgment. How is the Board going to come out? What is the likelihood of success before the Board? And it's relevant that there's substantial windowing that goes on before the complaint is filed in district court. I think it's also relevant to note that the Board has approved the Section 10J petition. And just to clarify the separation of functions within the agency here, the General Counsel is the prosecutorial arm of the Board. The Board members themselves are the adjudicative authority. But the statute, Section 10J itself, vests in the Board the power to approve a Section 10J petition. So before a 10J petition is filed in court, the claim is likely to come out before the Board, the adjudicator has already preliminarily signaled its view of the merits. That doesn't mean the Board has made up its mind. It hasn't seen all the evidence. But that's a relevant consideration for the district court to think about in determining whether there's a likelihood of success on the merits. MR. BOUTROUS. Counsel, you mentioned that it's a small number of — I forget exactly your framing — that what, reach the question in court about the application of the factors? MR. SCHROEDER. Out of the 20,000, there's only seven that get to court, right, last year. Those were the numbers. MR. BOUTROUS. You said, therefore, we should assume what? MR. SCHROEDER. I think what the Court should do is just to think about the fact that the Board has basically brought the cream of the crop cases before the Court. This is an expert agency that has said, we think these are the most deserving of relief. And as Justice Jackson was mentioning earlier, this isn't in a case where the Board is engaged in abuse or bringing all sorts of claims before courts. It's been highly selective. I don't know why the inference is the exact opposite, that these are the ones you really feel that you've got to put, you know, the best behind them, because these are the ones that are going to end up in court, the ones that are most vulnerable. MR. BOUTROUS. But the function of the Section 10J petition, Mr. Chief Justice, is to preserve the Board's remedial authority. So these are the cases where the Board is worried about irreparable harm accruing before the Board can issue its decision. MR. REINER. Mr. Reiner, I'm a little curious about your statistical argument. So let's say that your office files a motion for emergency relief, and you want to try to convince us that there's a probability that we're going to grant certiorari. If you, in making that argument, you say, look, we're very selective in the Solicitor General's Office about when we're going to petition for certiorari. We get lots of requests from the litigating divisions to file cert petitions, and we go along with that in a tiny minority of the cases. And we have quite a good record of success when we do petition for cert. Is that something we should consider in that context? MR. BOUTROUS. Justice Alito, I don't think there's any bar to the Court considering it. Justice, if I may. MR. REINER. Seriously? MR. BOUTROUS. I certainly don't think there's a bar. This is an equitable analysis. But I think the context here is different, and that Congress — MR. REINER. Yeah, I think it's — you're going to have to tell me why it's different. MR. BOUTROUS. The reason is that Congress has set up a scheme where the agency can seek 10-J relief to protect its own adjudicative authority. And as Justice Thaction mentioned, the history here is that initially there was pretty widespread judicial intrusion into labor disputes. And in 1932, Congress cut that off and said, we're not going to allow district courts to intervene. And in 1935, it centralized adjudication of disputes in the board. In 1947, it decided it had to walk back its restriction a little bit, and so it allowed Section 10-J relief. But it didn't allow Section 10-J relief for district courts to engage in a wide-ranging and intrusive involvement in labor disputes. It allowed courts to come in basically as ancillary to the agency proceedings and protect the integrity of those proceedings. And in that context, I do think it is relevant that the board is selective about the petitions that it files. MR. BOUTROUS. I appreciate that point, but would you agree that the likelihood of success on the merits inquiry means likelihood of success on the merits in this case? MR. BOUTROUS. As opposed to some other case? MR. BOUTROUS. As opposed to other cases? MR. BOUTROUS. Correct. It's a focus on this particular case. MR. BOUTROUS. It has to be focused. And so we have to look at the merits of this case, right? And so the Sixth Circuit's rule that you can't engage in fact-finding has to be wrong. MR. BOUTROUS. Justice Gorsuch, we agree that some fact-finding is permissible, and I think there's been a tendency to caricature what the Sixth Circuit is doing. There was a two-day evidentiary hearing in this case, and there was discovery. MR. GORSUCH. Well, the Sixth Circuit said fact-finding is inappropriate. MR. BOUTROUS. Correct. It did say that, and I agree that language, if taken out of context, could be read in that way. MR. GORSUCH. Okay. So that's wrong. MR. BOUTROUS. I agree that that statement on its own is wrong. MR. GORSUCH. Okay. Yeah. And you've walked through the four factors, which seems to suggest you agree there are indeed four factors. MR. BOUTROUS. We agree that all four considerations from Winter are relevant to this analysis. MR. GORSUCH. Do we apply the test the same way we usually apply it, as a general matter? MR. BOUTROUS. I think it – no, I – MR. GORSUCH. Does a district court apply it the same way as – MR. BOUTROUS. I think there has to be some translation to this context, and on – just focusing on likelihood of the merits for a moment. We think that there has to be a substantial legal theory, and that there has to be sufficient facts that a reasonable fact-finder could find for the board. And we do think that –  MR. GORSUCH. It's likelihood of success on the merits in the sense that you're assessing how likely is the board to succeed, and we think they have to show a reasonable probability of success. That's the standard that we think governs here, and we think that's consistent with – MR. BOUTROUS. Not likelihood of success reasonable? What's reasonable? What – is that – it's obviously – is that above 50 percent? Is that 30 percent? MR. GORSUCH. I'm hesitant to put a percentage on it, Justice Boutrous. MR. BOUTROUS. I'm not surprised. It's lower than 50. MR. GORSUCH. I think it's consistent. For example, you know, Justice Kavanaugh, your opinion in Labrador says fair prospect. I think that's generally along the lines of what we have in mind. We don't think reasonable probability necessarily needs a percentage to spell it out. MR. KAVANAUGH. So I'm sorry. Are you saying it's the same, or it's a lower bar than the usual likelihood of success standard as applied in courts every day under Winter? MR. BOUTROUS. We think that it is a lower standard, principally for the factual part, which I mentioned, which is we think if a reasonable fact-finder can find for the board, that is sufficient. We do think that that's effectively the test that the Sixth Circuit has been applying. I could point you to Osborne-Hesse, which is a decision where the Sixth Circuit says, look, the board has put in evidence that this is the case. MR. KAVANAUGH. And is the reason for this lower standard only that the board is, you know, generally restrained in asking for these along the lines that you said, or is there some other reason why we should apply, why courts should apply a lower standard? MR. BOUTROUS. I think it's a structural point, which is that Congress intended the board to be the primary adjudicator here. MR. KAVANAUGH. Well, it did intend the board to be the primary adjudicator, but it also gave this power over injunctions to the court. MR. BOUTROUS. Right. But we think that power has to be exercised cognizant of the fact that the board is going to be adjudicating this dispute. The court is not going to get out in front of the board. It's going to protect the board's authority. MR. KAVANAUGH. I don't see why that follows, because it's a preliminary analysis. It's just a quick look. And what happens in the merits happens at the merits. And in all sorts of alphabet soup agencies, we don't do this. District courts apply the likelihood of success test as we normally conceive it. So why is this particular statutory regime different than so many others that your friend points out? MR. BOUTROUS. Well, Justice Gorsuch, with respect to the statutes that they identify, the case law in the lower courts does not uniformly support them. It's actually quite mixed. There's a lot of it that supports our position. MR. KAVANAUGH. There's a lot on the other side, too. MR. BOUTROUS. I acknowledge that it is. MR. KAVANAUGH. An awful lot. And I just struggle to understand what you're asking lower courts to do and how it would be unique to the NLRB context as opposed to others. Cognizant as well that these injunctions often run against employers and for the benefit of unions, too. So whatever standard we come up with here, you know, goose and gander. We have to be cognizant of that. MR. BOUTROUS. I think to the extent you adopt a standard in this case, its generalizability will actually be fairly limited. There's only a handful of statutes they identify that allow injunctive relief in ending administrative proceedings. There's three in particular, the FTC, the EEOC, the Department of Labor. But other statutes, for example, simply involving the federal government, the authority to sue to enforce federal law, we don't think it would generalize because there's not the structural concerns I raised with Justice Kagan. MS. MOSS. Mr. Raynor, is that because what we're talking about here is a predictive judgment related to what the board is likely to find? That there are predictive judgments or there's the preliminary relief determination that courts are used to making, which is who's going to win, you know, from my perspective as between the parties that are before me, right? Someone's brought a complaint. Someone is defending. I'm looking at this preliminarily and making a judgment as to who's likely to win on the merits of the legal issue that they have brought. That's the ordinary course of things. I think, and maybe I'm wrong, and you can, that the predictive judgment here is not that. The predictive judgment here is the board is seeking injunctive relief to protect its remedial authority and what to the extent we're applying the four factors, it's the likelihood that the board is going to decide that there is an unfair layover of practice in this situation and reverse the stakes on the ground or whatever. Is that right? MR. RAYNOR. Yes, I do think that's correct. The board is the principal adjudicator here. We're trying to predict how they're going to come out. MS. MOSS. I don't see how that could possibly be, Mr. Raynor, that, you know, a court is supposed to say, well, I have one view of the law, but I'm just going to assume that the board has a different view of the law just because this case was brought? MR. RAYNOR. No, I took the firm ‑‑ MS. MOSS. It would be the court's view of the law, right? MR. RAYNOR. Well, I took the premise of Justice Jackson's question to be, for example, if there's an NLRB precedent that the court hasn't weighed in on yet, but we know that precedent is going to apply before the board, it would have to think about the fact that that precedent ‑‑ MS. MOSS. Yes, sure. If there's an NLRB precedent that, you know, that's the reigning, that's the governing law, the court is supposed to think about that. MR. RAYNOR. Correct. MS. MOSS. Because that's the governing law. MR. RAYNOR. Correct. MS. MOSS. But it's just supposed to think about that as a court doing what courts normally do, which is applying the law as the court finds it to a case. MR. RAYNOR. Yes, Justice Kagan. And if you all were inclined just to think that the likelihood of success test applies exactly the same way in this case that it does in others, I still would submit that it would be easier for the board to satisfy that test, principally because, as I mentioned earlier, the board has already approved the petition. It has signaled its preliminary view of the merits. MS. MOSS. But that means we're giving the board a boost because of the screening function that it's engaged in. And we're saying, well, you know, the board clearly thought it was meritorious when it had its prosecutorial hat on. So we should assume that when the board has its adjudicatory hat on, that it's going to rule in favor of itself. MR. RAYNOR. Justice Barrett, I acknowledge that the board could change its mind once it has all the evidence before it. It doesn't have the evidence before it, the ALJ hearing evidence, for example, at the time it approves the petition. But I would dispute the notion that it's acting in a prosecutorial role at this stage. It's approving the petition, the 10-J petition, to protect its adjudicative authority. And Congress hasn't given it, for example, the way that district courts have the authority to issue a P.I. to protect their own authority. Congress hasn't given that to the board and said, you have to ask the district court. MS. MOSS. Because the district court is an independent check, right? Because this is a big deal to have the injunction in place, no matter who it enjoins. So the district court is an independent check. So it seems like it should be just doing what district courts do, since it was given the authority to do it. MR. RAYNOR. Yes, we acknowledge this isn't a rumber stamp, and I think the success statistics in the various circuits bear that out. And we do think that there has to be an inquiry into the merits. Osborne-Hessy, again, is an example where the court said the evidence is overwhelmingly against the board. We're not going to blind ourselves to that. We're not going to grant relief here. There is some factual weighing that goes on. We're not disputing that it is a check. The only question is to what extent it should be a check. MR. BOUTROUS. Let me see if I can put it this way. So the district court is supposed to ask likelihood of success on the merits. Is it supposed to ask what I think of the likelihood of success on the merits, objectively, as best I can come up with, as neutral a judgment as I can muster? Or is it supposed to ask, well, I don't think you're likely to succeed, but I think the board will? Is that what, is that, that seems to me the delta between the positions here? And, you know, I, I, gosh, it's clear to me that you're, you know, your friend's going to win, but the board's going to rule otherwise. Is that, you know, is that really supposed to be what a district judge is supposed to do? MR. ZUCKERBERG. Well, Justice Gorsuch, I'm not sure, I guess, in that hypothetical what would be the basis for the discrepancy. MR. BOUTROUS. Nor would I, except for maybe the statistics you keep referencing, the fact that boards tend to win in front of boards. They sometimes lose in later review, but they win at least in front of the board. And I guess if we're going to take account of statistics, why not also ask how often the NLRB gets reversed? You know, I mean, where does it end? And why, again, shouldn't a district judge just ask, as best they can muster, with relevant NLRB precedent in mind, all of the law, all of the facts? They may have different facts before it, too, than the board did when it authorized the 10-J. It's going to hold a hearing. MR. ZUCKERBERG. Right. MR. BOUTROUS. So it's going to be a different factual record. It's going to look at all the law. What's wrong with the best judgment a neutral magistrate can issue? MR. ZUCKERBERG. Justice Gorsuch, setting aside our front-line position about how we think it's a lower standard here, if you thought it was the same standard, then our position is simply that all context should be considered. We're not contending that any one particular characteristic should be dispositive. Ours is the pro-context position. MR. BOUTROUS. Okay. But why, so why do you think it's a lower standard? MR. ZUCKERBERG. Justice Jackson, again, I think it's a couple things, but it's principally structural. We think the board is the adjudicator here. The role of the district court is to protect and facilitate the board's adjudication. MR. BOUTROUS. And that's in the statute from your, it's not your view of just sort of how it should be. MR. ZUCKERBERG. Correct. MR. BOUTROUS. You see, you read the statute as setting up this structure. MR. ZUCKERBERG. Yes, exactly. This is the function of a section 10-J petition. The 10-J petition expires when the board issues its order. At that point, there's a different allows the board to enforce its order in court. And so all we're talking about is a petition that's specifically designed to protect the board's adjudication. And again, the historical record supports this in the sense that Congress didn't want wide-ranging district court involvement in labor disputes. It wanted to give a limited district court authority to protect the board's adjudicative authority. MR. BOUTROUS. Why do you think Congress did that? MR. ZUCKERBERG. I think the reason is that in 1932, when it passed the Norris LaGuardia Act, it imposed very stringent restrictions on district court ability to issue injunctions. And in the postwar period, there was essentially a lot of labor unrest that courts weren't able to step in expeditiously and stop, and the court thought that was necessary. And so if you look at the legislative history of Congress, look, it sometimes takes the board a while to rule, and there might be a lot of harm inflicted in the meantime. So we need to give district courts the authority to prevent that harm while board proceedings are ongoing. MR. BOUTROUS. It's certainly true, though, that Congress was not eager to resuscitate the labor injunction in Debs, right? MR. ZUCKERBERG. Correct. MR. BOUTROUS. Yeah, and that was not a particularly glorious era for courts, and you would think therefore maybe a more restrictive injunctive test rather than a looser one might apply. MR. ZUCKERBERG. Well, Justice Gorsuch, I think I would actually frame it as— MR. BOUTROUS. Traditional rules of equity might — you might want them. MR. ZUCKERBERG. I would frame it actually a little differently. I think what Congress was concerned about doing was restricting the power of district courts in protecting the centralized adjudicative authority of the board. MR. BOUTROUS. Yes, and in restricting the power of district courts, you'd maybe want the full considerations of equity brought to bear rather than a looser standard that results in more judicial interference in labor affairs. MR. ZUCKERBERG. I recognize that that's one way to think about it, but our view is that ours is actually a more modest conception of the judicial role, which is that it's protecting the board's adjudicative authority rather than engaging in its own free-ranging exploration of the merits. MS. MCCAFFERTY. In this context, consistent with the kind of injunction that we're talking about here, it's not sort of protecting the parties in general, it's protecting this particular interest, which is the board's authority. MR. ZUCKERBERG. Exactly, and there's public — we are not suing on behalf of any private parties. The board is suing to protect public rights only, and we do think to the extent this is generalizable, it's actually a relatively limited set of statutes to which our rule here would apply. The Court has no further questions. CHIEF JUSTICE ROBERTS. Thank you, counsel. Do you agree with your friend on the other side that we can dispose of this in a short opinion? MR. ZUCKERBERG. Yes. CHIEF JUSTICE ROBERTS. Thank you. MR. RAYNOR. Justice Thomas. CHIEF JUSTICE THOMAS. Mr. Raynor, if the approach here is to protect the interests of the board, do other agencies benefit from the same — from this approach? And if they don't, why? MR. RAYNOR. Justice Thomas, as I acknowledged earlier, I think other agencies that have a specific statutory authority to seek injunctive relief pending agency proceedings likely could benefit from a similar kind of rule. We don't think that the rule that we're requesting here would apply to all the statutes that they cite, where, for example, the government simply has the ability to sue to enforce federal law. That doesn't have the same type of ancillary quality that we think the injunctive relief in this case does. CHIEF JUSTICE ROBERTS. Justice Alito. MR. ALITO. The ALJ rule last May, exceptions have been filed. How long is this going to take? MR. RAYNOR. The statistics are that typically from complaint to final board order is about two years. It varies somewhat every fiscal year, but about two years. So we're coming up on when you might expect the board to rule on that basis. The complaint — CHIEF JUSTICE ROBERTS. Does the injunction last until then, or last until what? MR. RAYNOR. It lasts until the board issues its order. At that point, there's a different statutory authority in TINI where the board can go get preliminary relief. CHIEF JUSTICE ROBERTS. Are we sure that before we rule, the board isn't going to have issued its preliminary injunction so that this case is mooted? MR. RAYNOR. I'm not sure about that. I'm not privy to what the board's timing will be, so I can't make any representations. If the board were to rule before this court were to rule, I think that there would be a question of bootiness because the petition would expire — the injunction would expire by its own terms. CHIEF JUSTICE ROBERTS. That's what I was asking. Thank you. MR. RAYNOR. And we would obviously make a submission on that point if that were to occur. CHIEF JUSTICE ROBERTS. Justice Kagan? JUSTICE KAGAN. I just want to make sure I completely understand how you think this case is narrowed. You started — you said — you quoted Ms. Blatt's reply brief as to irreparable I don't think that Ms. Blatt at all retreated from her reply brief today. So I take it that that's pretty much not at issue now and that the real question and dispute is whether the likelihood of success inquiry is ratcheted down somewhat. Is that what you understand the only issue and dispute to be? MR. RAYNOR. I think so, Justice Kagan, assuming that the way we understand irreparable harm is that it focuses on the board's remedial authority and there only has to be a reasonably likely showing of irreparable harm. And then on the public interest, our view is simply that Congress has said what the public interest here is. If you think there's been a likelihood of success on the violation, however you want to define that, by the time we get to public interest in weighing of the equities, it's going to have to be a pretty compelling private interest on the other side to overcome Congress's judgment that this kind of conduct should be illegal. JUSTICE KAGAN. And then with respect to the likelihood of success, you're not arguing, as I understand it, that somehow the court is supposed to say, well, let's pretend I'm not a court. Let's pretend that I'm the board. A court is supposed to do what a court does. Is that correct? MR. RAYNOR. Yes, Justice Kagan. JUSTICE KAGAN. Look at the law and make the best decision on the law. Now, you have a different standard that you think that the court ought to apply when the court looks at the law and makes the best decision on the law, and I understand that difference. But this isn't something where you're saying, like, the court is supposed to pretend to be the board. MR. RAYNOR. Justice Kagan, I think that's generally correct with a caveat. We do think it's relevant that the board has approved the petition, and we do think in circumstances where there may be a law or a rule that applies to the board but not to the district court, the district court would have to take that into account, for example, NLRB precedent. JUSTICE GINSBURG. Okay. Thank you. MR. RAYNOR. Just one thing. On irreparable harm, you just said reasonably likely, and I think they say likelihood. Are those the same things? MR. RAYNOR. Yes. I know. I think basically what we think it has to be reasonably necessary, and that's the way the Sixth Circuit framed it, and that's the test we would stand by. I don't think there's a whole lot of daylight between those different formulations. MR. RAYNOR. Thank you. JUSTICE BARRETT. Justice Barrett. MR. RAYNOR. Justice Jackson. JUSTICE JACKSON. One final thing. Why is it relevant in this context that the board has approved the petition when it wouldn't be in an ordinary scenario of the court just making the kind of determination that Justice Kagan put forward? MR. RAYNOR. Justice Jackson, in a normal scenario, the court itself is determining whether to issue a preliminary injunction. So it doesn't have reference to another actor that may or may not have approved preliminary relief. In this case, we know the board is the ultimate adjudicator, and we know that it has signaled its preliminary view of the merits by approving the petition. That type of structural relationship isn't present when the district court is issuing a preliminary injunction without regard to an agency request. I don't want to overstate this point. As I've mentioned, the board can change its mind once it hears the evidence. It hasn't prejudged. But we do think this is relevant to the predictive inquiry about how this case is going to come out, what the likelihood of success is. JUSTICE BARRETT. Thank you. CHIEF JUSTICE ROBERTS. Thank you, counsel. MR. RAYNOR. Thank you. CHIEF JUSTICE ROBERTS. Rebuttal, Ms. Black. MS. BLACK. Thank you. It may please the court. Just a couple things. On page 91 of the district court, the district court said, in terms of likelihood of success, my next inquiry focuses on whether there are any facts supporting each allegation without resolving conflicting evidence. So there's no question there was none of that. And in terms of the standard that as long as reasonable facts support the board's theory that should be enough, if that sounds familiar, it's because it's the standard for summary judgment, and that obviously is not the standard for an injunction. And it's a little bit ironic that that's the standard for summary judgment, because if you can survive summary judgment, at least we'd get a trial. So this is even worse than a party would have at summary judgment. So they should have to prove their case like any other party. In terms of the likelihood of success, just another thing to keep in mind, the only evidence that the district court is going to have is the evidence before the district court. In terms of the legal theory, the board has been very, very aggressive on some of its legal theories, including in a case where Starbucks sought discovery, the board turned around and called that an unfair labor practice, and then told the district court they had to defer to it. The board also says that you have to bargain with unions that have been decertified. So these are very serious legal questions that do come up. And the other thing, if they want deference onto their investigative decision, then why aren't they producing their litigation memo? I mean, really? That's what you're supposed to do when you get deference, is show your work. And this is obviously a privileged document, and their manual is a cookie-cutter thing saying here's how you get your litigation memo, here's how you get board approval. So at least disclose it. In terms of getting out in front, obviously the district court's findings aren't binding on the ALJ or the board. And in terms of the lower courts, the only thing I'll add is that almost all the cases that kind of watered down the standard are pre-winter. There was one post-winter case that didn't cite winter, and then the Ninth Circuit the government relied on and cited, the court said this is intentional with winter. We'd ask that the judgment be reversed. Thank you, counsel. The case is submitted.